UNITED STATE DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KRISTEN SHAW,<br><br>Plaintiff,<br><br>v.<br><br>NEW YORK STATE OFFICE FOR PEOPLE WITH DEVELOPMENTAL DISABILITIES; WILLIS LEGGETT, individually and in his official capacity; DAWN WELLINGTON, individually and in her official capacity; JAMES WRIGHT, individually and in his official capacity; and ISAIAH BROWN, individually and in his official capacity,<br><br>Defendants. | **COMPLAINT**<br><br>JURY TRIAL DEMANDED<br><br>1:25-cv-66 (AMN/ML) |

Plaintiff KRISTEN SHAW, by and through her attorneys, LaMarche Safranko Law PLLC, alleges as follows:

**PRELIMINARY STATEMENT**

1. Plaintiff Kristen Shaw ("Plaintiff" or "Ms. Shaw") brings this action to recover damages caused by defendants' severe, pervasive, and unlawful discrimination, sexual harassment, hostile work environment, and retaliation against her while employed as an employee of defendant NEW YORK STATE OFFICE FOR PEOPLE WITH DEVELOPMENTAL DISABILITIES ("OPWDD").

2. During her time as an employee of OPWDD, Ms. Shaw was subjected to severe and pervasive sexual harassment, discrimination, and retaliation by her supervisor, WILLIS LEGGETT ("Leggett"), including, but not limited to, a years' long course of inappropriate sexual comments, unwanted romantic advances, hostility and intimidation, including an incident in which Leggett physically and sexually assaulted Ms. Shaw at an OPWDD facility.

3. Ms. Shaw made numerous reports to her superiors and supervisors at OPWDD, including defendants DAWN WELLINGTON ("Wellington"), JAMES WRIGHT ("Wright"), and ISAIAH BROWN ("Brown"), regarding Leggett's harassment, discrimination, and retaliation. Nevertheless, defendants deliberately and intentionally ignored and disregarded Ms. Shaw's complaints, and then retaliated against her by subjecting her to a campaign of retaliatory harassment and discipline, including, but not limited to, baselessly threatening and imposing discipline upon her, forcing her to work under the direct supervision of her abuser, Leggett, manipulating her schedule to force her to work undesirable shifts, spreading malicious falsehoods about her amongst her coworkers, and then ultimately, terminating her employment at OPWDD.

**PARTIES AND JURISDICTION**

4. Plaintiff KRISTEN SHAW is a female woman residing and domiciled in the County of Albany, State of New York.

5. Plaintiff was employed by defendant OPWDD from on or about April 28, 2016 until her termination in or about February 2022.

6. Defendant New York State Office for People with Developmental Disabilities ("OPWDD") is an agency of the State of New York organized and existing under the laws of the State of New York, with a principal place of business located in the County of Albany, State of New York.

7. OPWDD is tasked with and responsible for coordinating services for New Yorkers with developmental disabilities.

8. OPWDD employs more than 20,000 individuals throughout the State of New York.

9. OPWDD owns and operates numerous residential group homes throughout the State of New York serving individuals with developmental disabilities, including a facility located at 397 Delaware Avenue, Delmar, New York 12054.

10. Upon information and belief, defendant WILLIS LEGGETT ("Leggett") is an individual residing and domiciled in the State of New York.

11. At all relevant times, Leggett was and is employed as a supervisor by OPWDD, and was vested with supervisory authority over Plaintiff.

12. Upon information and belief, defendant DAWN WELLINGTON ("Wellington") is an individual residing and domiciled in the State of New York.

13. At all relevant times, defendant DAWN WELLINGTON was and is employed as a supervisor by OPWDD, and was vested with supervisory authority over Plaintiff.

14. Upon information and belief, defendant JAMES WRIGHT ("Wright") is an individual residing and domiciled in the State of New York.

15. At all relevant times, Wright was and is employed as a supervisor by OPWDD, and was vested with supervisory authority over Plaintiff.

16. Upon information and belief, defendant ISAIAH BROWN ("Brown") is an individual residing and domiciled in the State of New York.

17. At all relevant times, Brown was and is employed as a supervisor by OPWDD, and was vested with supervisory authority over Plaintiff.

## VENUE AND JURISDICTION

18. This Court has original jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1334, 42 U.S.C. 2000e-5(f)(3), and 42 U.S.C. § 1983.

19. This Court has supplemental jurisdiction over Plaintiff's state law causes of action pursuant to 28 U.S.C. § 1367.

20. Venue is proper in this district because a substantial part of the events and omissions giving rise to Plaintiff's causes of action occurred in this district, including each of the specific acts of harassment, discrimination, and retaliation complained of herein.

21. Plaintiff timely and duly filed a charge of discrimination with the United States Equal Employment Opportunity Commission (EEOC) on or about October 21, 2019. EEOC thereafter purportedly opened an investigation into the charge.

22. On October 21, 2024, having failed to reach a determination with regard to Plaintiff's charge of discrimination, EEOC notified Plaintiff's counsel that it was issuing a Notice of Right to Sue Within 90 Days (the "Notice of Right to Sue").

23. Plaintiff's counsel received the Notice of Right to Sue on October 21, 2024.

24. This action is timely commenced inasmuch as it is filed within 90 days of Plaintiff's receipt of the Notice of Right to Sue.

25. Plaintiff has complied with all relevant administrative prerequisites to suit.

**FACTS**

26. Ms. Shaw was hired as an employee of OPWDD on or about April 28, 2016.

27. Upon commencing employment with OPWDD, Ms. Shaw was assigned by OPWDD to work at a group home operated by OPWDD, located at 397 Delaware Avenue, Delmar, New York 12054 (the "Delmar Facility").

28. Ms. Shaw was assigned to work alongside and under the direct supervision of Leggett at the Delmar Facility.

29. Shortly after beginning her employment at the Delmar Facility, Leggett asked Ms. Shaw to go out with him on a date.

30. Ms. Shaw was not interested in a romantic relationship with Leggett and politely declined.

31. Nevertheless, Leggett continued to attempt to exert pressure upon Ms. Shaw to enter into a romantic relationship.

32. Beginning in or about May 2016, Leggett began repeatedly calling Ms. Shaw on her personal cell phone number at all hours of the day and night and outside of working hours.

33. During such calls, Leggett would make unwelcome sexual comments such asking Ms. Shaw to go out with him, inquiring about her relationship status and personal life, and making comments about her physical appearance and attributes.

34. Leggett informed Ms. Shaw that she was required to accept his calls at all hours because she was a probationary employee.

35. Ms. Shaw asked Leggett to stop calling her and making unwelcome comments but he refused, and the calls continued.

36. Leggett also made inappropriate sexual remarks to Ms. Shaw multiple times per week at the Delmar Facility beginning in or about May 2016, including commenting on her physical appearance and attributes, asking about her personal life and sexual activity, demanding that she accompany him on dates, and angrily accusing her of being involved romantically with her co-workers rather than him.

37. Leggett persisted in making these comments despite Ms. Shaw's repeated requests that he stop, and the fact that she had unequivocally informed him that she was not interested in him romantically.

38. Leggett also regularly subjected Ms. Shaw to unwelcome acts of inappropriate physical contact.

39. On no fewer than ten occasions beginning in or about May 2016, Leggett intentionally brushed up against Ms. Shaw in an intimate manner, rubbed his hands over her arms and shoulders, and cornered her in a physically intimidating manner to prevent her from avoiding his advances.

40. These unwelcome acts of physical and verbal harassment occurred on a continuing basis throughout Ms. Shaw's time working with Leggett at the Delmar Facility.

41. In or about September 2017, Leggett informed Ms. Shaw that he was effectively immune from any discipline from OPWDD management because he had compromising information about criminal activities allegedly undertaken by a senior OPWDD official in the course of her employment.

42. In or about September 2017, Ms. Shaw reported Leggett's ongoing sexual harassment and discrimination to her supervisor, defendant Wright.

43. In response, Wright informed Ms. Shaw that Leggett was a personal friend of his but promised that he would nevertheless "take care of it."

44. Upon information and belief, Wright thereafter informed Leggett that Ms. Shaw had reported him for sexual harassment.

45. Despite reporting the sexual harassment, no corrective measures were taken by OPWDD or Wright, and Ms. Shaw continued to be subjected to the aforementioned harassment and discrimination by Leggett.

46. Moreover, shortly after reporting Leggett's harassment to James, in or about September 2017, Ms. Shaw was angrily confronted by Leggett.

47. Leggett forcefully grabbed Ms. Shaw's arm, causing her pain and discomfort, and demanded to know why Ms. Shaw had reported him for harassment, why she had been resisting his romantic overtures, and accused her of being in a romantic relationship with one of her co-workers, P.M.

48. Upon information and belief, such actions were in retaliation for Ms. Shaw reporting Leggett's harassment and discrimination.

49. During the relevant period, Ms. Shaw's relationship with P.M. was entirely platonic, notwithstanding Leggett's paranoid and hostile accusations to the contrary.

50. Leggett's actions reasonably caused Ms. Shaw significant fear and anxiety.

51. Later the same month, Leggett physically assaulted P.M. at work. Upon information and belief, such assault was in retaliation for Ms. Shaw resisting and reporting Leggett's sexual harassment.

52. Rather than taking action to protect Ms. Shaw from Leggett, in or about January 2019 OPWDD instead *promoted* Leggett to the position of DSAl Supervisor, giving him even more authority over Ms. Shaw.

53. After his promotion, Leggett warned Ms. Shaw that "things are going to change around here."

54. Upon information and belief, Leggett's comments were intended to frighten and intimidate Ms. Shaw, and prevent her from disclosing his ongoing and additional acts of sexual harassment.

55. Indeed, Leggett continued his physical and verbal harassment and discrimination of Ms. Shaw, emboldened by OPWDD's failure and refusal to take any action in response to Ms. Shaw's complaints, and further fueled by his retaliatory animus towards Ms. Shaw for her complaints.

56. As a result of the continuous, unabated harassment, Ms. Shaw suffered, among other things, severe mental and emotional distress, including but not limited to, increased anxiety, depression, loss of sleep, humiliation, embarrassment, stress, loss of self-esteem, loss of self-confidence, inability to focus or concentrate, fearfulness, need for medication, and panic attacks, which required medical treatment and evaluation.

57. On or about June 28, 2019, Ms. Shaw mustered the courage to again report Leggett's ongoing sexual harassment, discrimination, and retaliation, notwithstanding Leggett's attempts to threaten and intimidate her into silence.

58. Ms. Shaw called defendant Wellington and pleaded that she did not want to have to be subjected to Leggett's ongoing sexual comments and advances.

59. In order to convince Ms. Shaw to report to work, Wellington convinced Ms. Shaw that necessary action would be taken to cease Leggett's harassment and discrimination.

60. However, the very next day, June 29, 2019, Leggett violently berated Ms. Shaw during a dispute over a workplace matter at the Delmar Facility, screaming inches from her face, and making contact with her with his body.

61. As Ms. Shaw attempted to flee the room, Leggett injured Ms. Shaw by forcefully slamming the door on her foot, resulting in severe pain and nerve damage.

62. Immediately after Leggett's assault, Ms. Shaw telephoned Wellington and reported it to her.

63. In response, Wellington advised Ms. Shaw to go home for the day.

64. As Ms. Shaw was preparing to leave, Leggett approached Ms. Shaw from behind, cornered her to prevent her escape, and pressed his body up against hers while grinding his pelvis against her buttocks.

65. While assaulting Ms. Shaw, Leggett whispered into Ms. Shaw's ear about how she should not "disobey" him.

66. Ms. Shaw demanded that Leggett back away from her, but he refused to do so. Leggett finally backed away only after he heard another employee approaching.

67. The following day, June 30, 2019, Ms. Shaw again spoke with Wellington and again requested that she take corrective action to protect her from Leggett and to put an end to his ongoing sexual harassment, discrimination, and retaliation.

68. In response, Wellington informed Ms. Shaw that she was afraid that if she reported Leggett to her superiors that she (Wellington) would herself face disciplinary consequences.

69. Wellington further advised Ms. Shaw that she could not afford to lose her job and did not want to get involved by reporting Leggett, but that she would nevertheless take action regarding Leggett's slamming the door closed on her foot.

70. However, one week later on July 6, 2019, Ms. Shaw was summoned to a meeting with Wellington and Leggett.

71. Ms. Shaw initially assumed the meeting was for the purpose of investigating or imposing discipline on Leggett for his conduct. Remarkably, however, upon arriving to the meeting she was informed that the meeting had in fact been convened for the purpose of imposing a disciplinary counseling upon Ms. Shaw for allegedly failing to follow the proper chain of command when contacting Wellington about Leggett.

72. Ms. Shaw requested to know what specific policy she had broken by contacting Wellington, but neither Leggett nor Wellington provided an answer.

73. Instead, Wellington mocked Ms. Shaw by asking her if she "need[ed] a policy to take a piss?"

74. Ms. Shaw was then informed by Leggett and Wellington that she was being "written up."

75. Upon information and belief, such disciplinary action was unwarranted and retaliatory in nature based upon Ms. Shaw's opposition to Leggett's sexual harassment and discrimination.

76. At the conclusion of the disciplinary counseling, Wellington approached Ms. Shaw outside of Leggett's presence and warned her that none of her superiors at OPWDD would listen to Ms. Shaw about Leggett's harassment and discrimination, and that OPWDD management had discussed the matter and agreed that if Ms. Shaw raised any objection to being disciplined that they would fabricate the explanation that the disciplinary counseling was merely a "re-training."

77. On several occasions during the following weeks Ms. Shaw's co-workers at the Delmar Facility harassed her by calling her a "snitch", presumably for reporting Leggett's harassment, discrimination, and retaliation.

78. Upon hearing such insults, Ms. Shaw contacted Wellington to inquire how other employees had learned that she had confided in her regarding Leggett's harassment and discrimination and requested to know what action was being taken in response.

79. Wellington responded by stating that she did not want to get involved.

80. On July 7, 2019, Ms. Shaw sent an email to several senior management officials at OPWDD regarding the ongoing harassment and misconduct by Leggett and lack of corrective action by OPWDD. She did not receive any response.

81. On or about July 15, 2019, Ms. Shaw then reported Leggett's ongoing harassment and discrimination to OPWDD Human Resource employees Diane Slater and another representative (Emily).

82. In response, the OPWDD Human Resource representatives informed Ms. Shaw that they were not the appropriate persons to take her sexual harassment complaint and provided a phone number for the Governor's Office of Employee Relations ("GOER").

83. They further advised that, because she had been injured by Leggett, OPWDD needed her to complete a workplace violence form, worker's compensation paperwork, and that Wellington needed to complete an incident report.

84. On or about July 16, 2019, Ms. Shaw filled out a workplace violence form and worker's compensation paperwork and approached Wellington to request that she complete an incident report related to Leggett's June 29th assault and battery.

85. However, Wellington inexplicably refused to fill out the incident report or the supervisor portion of the workplace violence form.

86. Upon information and belief, such refusal was in retaliation for reporting Leggett's harassment to Human Resources.

87. Wellington advised Ms. Shaw that OPWDD senior managers were upset with her for the email that she had sent complaining about Leggett's harassment and OPWDD inaction, and threatened Ms. Shaw that if she did so again she would be subject to discipline.

88. On or about July 16, 2019, Ms. Shaw contacted GOER to report Leggett's ongoing sexual harassment, discrimination, and retaliation.

89. In response, GOER initially sought to have Ms. Shaw transferred to another less-desirable facility while permitting Leggett to remain at the Delmar Facility.

90. GOER declined to pursue the plan after Ms. Shaw objected to being forced to transfer to a less desirable facility due to Leggett's misconduct.

91. Instead, Ms. Shaw's work schedule was briefly changed to reduce her scheduled time working in the Delmar Facility with Leggett.

92. Ms. Shaw was nevertheless often forced to come in contact with Leggett when arriving for or leaving her shifts.

93. On or about October 21, 2019, Ms. Shaw filed her charge regarding Leggett's sexual harassment and OPWDD's inaction with the EEOC.

94. Nevertheless, on May 8, 2020, OPWDD re-assigned Leggett to serve as Ms. Shaw's direct supervisor notwithstanding the fact that Ms. Shaw had a pending EEOC charge against him alleging acts of sexual assault, harassment, discrimination, and retaliation.

95. Upon learning the Leggett had been reassigned to serve as her direct supervisor, Ms. Shaw immediately called Wellington to protest being forced to work under his direct personal supervision.

96. Wellington wholly disregarded Ms. Shaw's concerns, and callously informed her that Leggett would not merely be serving as her direct supervisor for that one day, but on a *permanent* basis moving forward.

97. On May 9, 2019, Ms. Shaw followed up with Wellington via email, and again advised that she was not comfortable working under the supervision of Leggett.

98. The same day, Wellington confronted Ms. Shaw at the Delmar Facility and told her that she did not need to respond to her email because it had "nothing to do with [her]."

99. Thereafter, Ms. Shaw was forced to work at the Delmar Facility with Leggett acting as her direct supervisor.

100. On numerous occasions after May 8, 2020, Leggett sought to get other employees at the Delmar Facility to leave, which would have resulted in him being alone in the facility with Ms. Shaw.

101. Moreover, Leggett continued to subject Ms. Shaw to further acts of discrimination and harassment. For instance, on July 5, 2020, Leggett came to the Delmar Facility outside of his scheduled hours and intentionally brushed up against Ms. Shaw's body in the kitchen.

102. Afterwards, Leggett telephoned other employees at the Delmar Facility and asked them to say that they had requested him to report to the facility.

103. Upon information and belief, defendants action in reassigning Leggett as her direct supervisor working in direct, close proximity with her at the Delmar Facility, was in retaliation for Ms. Shaw's opposition to Leggett's harassment and OPWDD's inaction, including, among other things, her filing a charge with the EEOC on or about October 21, 2019.

104. Moreover, in or about July 2020, Ms. Shaw learned that Wellington was telling other OPWDD employees that Ms. Shaw was a liar, and had warned them not to believe anything Ms. Shaw said.

105. Additionally, in or about July 2020, Wellington informed at least one OPWDD employee that she would "beat up" anyone that made her go to court pertaining to Ms. Shaw's complaints.

106. Beginning in or about July 2020, Wellington also manipulated Ms. Shaw's schedule to force her to work consecutive, unscheduled shifts, and to force her to extend her shifts beyond her scheduled hours, in violation of OPWDD policy.

107. On or about August 8, 2020, Ms. Shaw contacted Wellington's supervisor, defendant Isaiah Brown, to complain that she was being retaliated against by Wellington.

108. On August 13, 2020, having not heard back, Ms. Shaw again contacted Brown. Brown advised Ms. Shaw that he could not do anything about Wellington improperly scheduling her in violation of OPWDD policy.

109. Moreover, during the call, Brown threatened Ms. Shaw that “a little birdy” had told him that Ms. Shaw had been improperly using her cell phone while at work, and further warned that she was “on notice.” Brown’s allegations were entirely unfounded, and, upon information and belief, in retaliation for Ms. Shaw opposing Wellington’s retaliation, OPWDD’s inaction, and Leggett’s harassment.

110. On August 14, 2020, Ms. Shaw learned that Wellington had threatened her co-worker, P.M., that if he continued to communicate with Ms. Shaw regarding Wellington’s retaliatory manipulation of Ms. Shaw’s schedule, that Wellington would force him to work a triple shift (20 consecutive hours).

111. Thereafter, on August 15, 2020, Wellington once again manipulated the Delmar Facility schedule in a manner to force Ms. Shaw to work an unscheduled, 16.5 consecutive hour shift, despite such a shift being a violation of OPWDD policy.

112. The next day, Wellington again forced Ms. Shaw to work a 16 consecutive hour shift.

113. Upon information and belief, Wellington’s actions in manipulating the Delmar Facility schedule in a manner intended to force Ms. Shaw to work undesirable and unscheduled hours was in retaliation for her opposition to Leggett’s harassment and discrimination, OPWDD’s inaction, and other acts of retaliation by Wellington.

114. As a result of the mental and emotional harm caused by defendants' individual and collective harassment, discrimination, retaliation, and hostile working environment, Ms. Shaw was forced to go on leave from OPWDD beginning on or about December 12, 2021.

115. On or about January 31, 2022, Ms. Shaw was directed to attend a "pre-termination interview" with Amy Link, Associate Director Human Resources 1 at OPWDD.

116. During the pre-termination interview, Ms. Shaw advised Ms. Link that her inability to return to work was due to the harassment, discrimination, and retaliation she was facing at OPWDD, which she had previously detailed in numerous internal complaints, and a charge of discrimination filed with the EEOC.

117. By letter dated February 15, 2022, Ms. Shaw was informed that her employment had been terminated by OPWDD and that such termination would not be rescinded.

118. Upon information and belief, such termination was discriminatory, and in retaliation for Ms. Shaw's opposition to Leggett's harassment and discrimination, and other acts of retaliation by defendants.

119. Leggett continued to be employed by OPWDD at the Delmar Facility and, upon information and belief, was not subject to any discipline.

**FIRST CAUSE OF ACTION**
**Sexually Abusive and Hostile Work Environment in Violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, *et seq*.**
**Against All Defendants**

120. Plaintiff repeats and realleges each and every one of the foregoing paragraphs as though fully set forth herein.

121. The aforementioned acts of harassment, discrimination, and retaliation by defendants, individually and collectively, were unwelcome, severe and pervasive, and so

subjectively and objectively offensive so as to create a sexually abusive and hostile workplace permeated with discriminatory intimidation, ridicule, and insult.

122. At all relevant times, Plaintiff subjectively perceived her working environment to be sexually abusive and a hostile work environment, and a similarly situated reasonable person would likewise consider such working environment to be sexually abusive and hostile.

123. Such discriminatory intimidation, ridicule, and insult unreasonably interfered with Plaintiff's work performance.

124. Defendants are responsible for the creation of such hostile and abusive working environment as a result of their deliberate indifference to Plaintiff's complaints of sexual harassment, discrimination, and retaliation, failure to adequately manage, train, supervise, control, and direct the actions of their subordinates, agents, and employees so as to allow the creation and continuation of such hostile and abusive working environment, by failing to respond to Plaintiffs' complaints regarding such hostile and abusive working environment, by failing to exercise reasonable care to prevent, investigate, or remediate such conduct, by failing to implement programs and policies to discourage or address such conduct, by adopting, implementing, and by encouraging de facto policies, procedures, and customs that effectively suppressed Plaintiffs' attempts to report and remedy such hostile and abusive working environment, and by allowing its employees and agents to engage in acts and omissions which affirmatively created such hostile and abusive working environment.

125. Defendants' unlawful actions were motivated by discriminatory animus towards Plaintiff as a female woman, as well as discriminatory and retaliatory intent and animus.

126. Defendants' unlawful actions were intentional, malicious, and/or done with reckless disregard for Plaintiff's rights.

127. As a direct and proximate result, Ms. Shaw has sustained significant economic and non-economic damages, including, but not limited to, lost wages and benefits, damage to her reputation, severe mental and emotional pain and suffering, physical injuries, attorneys fees, and legal expenses, for which she is entitled to relief in an amount to be determined at trial.

**SECOND CAUSE OF ACTION**
**Retaliation Environment in Violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq.**

128. Plaintiff repeats and realleges each and every one of the foregoing paragraphs as though fully set forth herein.

129. Plaintiff opposed, objected to, and resisted defendants' unlawful harassment, discrimination, and retaliation by, among other things, physically resisting Leggett's sexual and physical assaults and harassment, making formal and informal complaints to her superiors at OPWDD, and by filing a charge of discrimination with the EEOC.

130. In retaliation, Defendants, individually and collectively, took materially adverse action against Plaintiff by, among other things, maintaining and creating a hostile work environment; refusing to take appropriate action to investigate or prevent further acts of discrimination, harassment, and retaliation; assigning Plaintiff's abuser as her direct supervisor; threatening Plaintiff with discipline; imposing baseless discipline upon Plaintiff; refusing to perform administrative functions necessary for Plaintiff to file further complaints; subjecting Plaintiff to verbal abuse and further retaliation; threatening harm to those who sought to assist Plaintiff; forcing Plaintiff to work less desirable shifts and work assignments; and by terminating her employment.

131. Such retaliatory acts were sufficient to deter a reasonable person from engaging in protected activity under Title VII of the Civil Rights Act of 1964.

132. Defendants' unlawful actions were motivated by discriminatory animus towards Plaintiff as a female woman, as well as discriminatory and retaliatory intent and animus.

133. Defendants' unlawful actions were intentional, malicious, and/or done with reckless disregard for Plaintiff's rights.

134. As a direct and proximate result, Ms. Shaw has sustained significant economic and non-economic damages, including, but not limited to, lost wages and benefits, damage to her reputation, severe mental and emotional pain and suffering, physical injuries, attorneys fees, and legal expenses, for which she is entitled to relief in an amount to be determined at trial.

**THIRD CAUSE OF ACTION**
**Sex Discrimination in Violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq.**

135. Plaintiff repeats and realleges each and every one of the foregoing paragraphs as though fully set forth herein.

136. As a female woman, Plaintiff is a member of a protected class.

137. Plaintiff was qualified for her employment at OPWDD.

138. Throught their actions and omissions, defendants, individually and collectively, subjected Plaintiff to intentional discrimination on the basis of her gender/sex, by, among other things, subjecting Plaintiff to unwarranted, adverse employment actions, unwanted comments of a personal and sexual nature, forcible sexual touching and assault, by maintaining and creating a hostile work environment; refusing to take appropriate action to investigate or prevent further acts of discrimination, harassment, and retaliation; assigning Plaintiff's abuser as her direct supervisor; threatening Plaintiff with discipline; imposing baseless discipline upon Plaintiff; refusing to perform administrative functions necessary for Plaintiff to file further complaints; subjecting Plaintiff to verbal abuse and further retaliation; threatening harm to those who sought to assist

Plaintiff; forcing Plaintiff to work less desirable shifts and work assignments; and by terminating her employment.

139. Similarly situated male employees were not subjected to such conduct.

140. Defendants' unlawful actions were motivated by discriminatory animus towards Plaintiff as a female woman, as well as discriminatory and retaliatory intent and animus.

141. Defendants' unlawful actions were intentional, malicious, and/or done with reckless disregard for Plaintiff's rights.

142. As a direct and proximate result, Ms. Shaw has sustained significant economic and non-economic damages, including, but not limited to, lost wages and benefits, damage to her reputation, severe mental and emotional pain and suffering, physical injuries, attorneys fees, and legal expenses, for which she is entitled to relief in an amount to be determined at trial.

**FOURTH CAUSE OF ACTION**
**Gender/Sex Discrimination and Retaliation in Violation of N.Y. Executive Law § 290 et seq.**
**Against All Defendants**

143. Plaintiff repeats and realleges each and every one of the foregoing paragraphs as though fully set forth herein.

144. Through their unlawful acts of discrimination, harassment, and retaliation, set forth herein, defendants, individually and collectively, engaged in unlawful employment practices and discriminated against Plaintiff on the basis of her sex and gender, and subjected Plaintiff to inferior terms, conditions and privileges of employment.

145. Through their acts of retaliation, set forth herein, Defendants, individually and collectively, retaliated and discriminated against Plaintiff for opposing defendants' gender/sex discrimination, harassment, and retaliation by, among other things, physically resisting Leggett's

sexual and physical assaults, making formal and informal complaints to her superiors at OPWDD, and by filing a charge of discrimination with the EEOC.

146. Defendants' unlawful actions were motivated by discriminatory animus towards Plaintiff as a female woman, as well as discriminatory and retaliatory intent and animus.

147. Defendants' unlawful actions were intentional, malicious, and/or done with reckless disregard for Plaintiff's rights.

148. As a direct and proximate result, Ms. Shaw has sustained significant economic and non-economic damages, including, but not limited to, lost wages and benefits, damage to her reputation, severe mental and emotional pain and suffering, physical injuries, attorneys fees, and legal expenses, for which she is entitled to relief in an amount to be determined at trial.

**FIFTH CAUSE OF ACTION**
**Aiding and Abetting Gender/Sex Discrimination in Violation of N.Y. Executive Law § 290 et seq.**
**Against All Defendants**

149. Plaintiff repeats and realleges each and every one of the foregoing paragraphs as though fully set forth herein.

150. Defendants, through their conduct set forth herein, individually and collectively, aided, abetted, incited, compelled, and coerced the unlawful gender/sex discrimination and retaliation of Plaintiff by each of the other defendants.

151. Defendants' unlawful actions were motivated by discriminatory animus towards Plaintiff as a female woman, as well as discriminatory and retaliatory intent and animus.

152. Defendants' unlawful actions were intentional, malicious, and/or done with reckless disregard for Plaintiff's rights.

153. As a direct and proximate result, Ms. Shaw has sustained significant economic and non-economic damages, including, but not limited to, lost wages and benefits, damage to her reputation, severe mental and emotional pain and suffering, physical injuries, attorneys fees, and legal expenses, for which she is entitled to relief in an amount to be determined at trial.

**SIXTH CAUSE OF ACTION**
**42 U.S.C. § 1983 – Equal Protection Violation**
**Against Defendants Leggett, Wellington, Wright, and Brown**

154. Plaintiff repeats and realleges each and every one of the foregoing paragraphs as though fully set forth herein.

155. At all relevant times, defendants Leggett, Wellington, Wright, and Brown (the "Individual Defendants") were acting under color of state law when engaging in the unlawful harassment, discriminatory and retaliatory conduct set forth herein.

156. Each of the Individual Defendants were Plaintiff's supervisors, and personally involved in the aforementioned unlawful harassment, discrimination, and retaliation.

157. Through their unlawful conduct set forth herein, the Individual Defendants subjected Plaintiff to a deprivation of rights, privileges, and/or immunities secured by the equal protection clause of the United States Constitution, federal law, and the laws of the State of New York.

158. Defendants' unlawful actions were motivated by discriminatory animus towards Plaintiff as a female woman, as well as discriminatory and retaliatory intent and animus.

159. Defendants' unlawful actions were intentional, malicious, and/or done with reckless disregard for Plaintiff's rights.

160. As a direct and proximate result, Ms. Shaw has sustained significant economic and non-economic damages, including, but not limited to, lost wages and benefits, damage to her

reputation, severe mental and emotional pain and suffering, physical injuries, attorneys fees, and legal expenses, for which she is entitled to relief in an amount to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment:

I. By declaring that the defendants herein, collectively and individually, engaged in violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq., N.Y. Executive Law § 290 et seq., and 42 U.S.C. § 1983;

II. Permanently enjoining defendants from further acts of harassment, discrimination, and retaliation with regard to Plaintiff;

III. Awarding Plaintiff damages for lost wages and benefits, damage to her reputation, severe mental and emotional pain and suffering, physical injuries, attorneys' fees, and legal expenses, in an amount to be determined at trial;

IV. Awarding Plaintiff punitive damages in an amount to be determined at trial;

V. Assessing civil fines and penalties pursuant to the New York State Human Rights Law § 297;

VI. Awarding Plaintiff reasonable attorneys' fees, costs and disbursements; and

VII. Granting such other and further relief as this Court deems just and proper.

Dated: January 14, 2025

s/Joshua R. Friedman, Esq. (Bar Roll #520628)
LaMarche Safranko Law PLLC
987 New Loudon Road
Cohoes, New York 12047
(518) 982-0770
JFriedman@LSLawNY.com